IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| TYRONE GILL,<br><br>                   **Plaintiff,**<br><br>v.<br><br>DANIEL SULLIVAN, JUSTIN JOHNSON, NANCY RUSH (as special representative of the late STEWART RUSH), SHANE SMITH, TINA SANDSTROM, and DEREK SMITH,<br><br>                   **Defendants.** | Case No. 19-cv-1405-NJR |

# MEMORANDUM AND ORDER

**ROSENSTENGEL, Chief Judge:**

      Plaintiff Tyrone Gill, an inmate of the Illinois Department of Corrections ("IDOC") currently incarcerated at Lawrence Correctional Center, brings this action pursuant to 42 U.S.C. § 1983 for deprivations of his constitutional rights while he was housed at Big Muddy River Correctional Center ("Big Muddy"). His Complaint (Doc. 1) alleges violations of his Eighth and First Amendment rights.

      This matter is now before the Court on Defendant Tina Sandstrom's motion for summary judgment (Docs. 104, 105).[1] Gill filed a response (Doc. 115) in opposition to the motion. Sandstrom filed a reply (Doc. 116).

---

[1] Defendants Justin Johnson, Nancy Rush, Derek Smith, Shane Smith, and Daniel Sullivan also have a motion for summary judgment pending (Doc. 113). As it addresses different issues than Sandstrom's motion, it will be addressed by separate order.

## BACKGROUND

On December 31, 2019, Gill filed his Complaint (Doc. 1) alleging violations of his constitutional rights related to a bleach spill on his gallery on October 4, 2019. As it relates to Defendant Sandstrom, Gill was allowed to proceed on the following single count:

> Count 2:    Tina Sandstrom was deliberately indifferent under the Eighth Amendment to Gill's chest pains following the spilled bleach incident.

(Doc. 14, p. 5).

On October 4, 2019, Gill was housed in the segregation unit at Big Muddy (Doc. 105-1, p. 28). At approximately 10:45 a.m., an inmate porter poured two jugs of chemicals on the floors in the unit and started mopping the floors (*Id*. at pp. 30-31, 33-34; 105-4, p. 3). Gill testified that all of the inmates, himself included, started coughing and choking (*Id*. at p. 31, 42). He also testified to having chest pains (*Id*. at p. 42).

Shortly after the chemicals were poured out, Nurse Sandstrom entered the gallery (*Id*. at pp. 31, 40). Gill believed it was approximately five to seven minutes after the chemicals were poured (*Id*. at p. 73). Sandstrom testified that she went to the gallery to provide eye drops to an inmate (Doc. 105-2, p. 9). When she went through the door by the officer's desk just before the gallery, she noticed a smell of bleach and asked what had happened (*Id*. at p. 6). Sandstrom testified that the door to the yard was open, and an officer was heading towards the gallery with a fan (*Id*. at p. 8). She asked if he was taking the fan down to get the chemical smell out, and he acknowledged that was his intent (*Id*. at 8-9).

Gill testified that he believed Sandstrom directed officers to open the doors

(Doc. 105-1, pp. 40, 74-77, 82, 84-85, 99). Gill testified that the doors were opened after Sandstrom entered, and the porter began cleaning up the chemicals with clear water (*Id.* at p. 41, 75). According to Gill, Sandstrom directed the officers to air the gallery out (*Id.* at p. 77, 81). Gill testified that she left shortly after instructing the doors to be opened (*Id.* at p. 75). He only saw Sandstrom for the short time when she entered the gallery, and she was not involved in any subsequent treatment that he received (*Id.* at p. 80).

Sandstrom testified she delivered the eye drops to the inmate. She went halfway down the wing to provide the drops (Doc. 105-2, p. 9). The prisoner she was visiting did not complain about the smell, but other prisoners were complaining. She heard of a lot of yelling, including statements like, "Help me. I can't breathe. My eyes are burning. I am going to get sick." (*Id.* at pp. 9-10). According to Sandstrom it was hard to tell who was saying what due to the amount of yelling (*Id.* at p. 13). Gill acknowledged that he and approximately 20 other inmates called to her asking for help (Doc. 105-1, p. 76). Sandstrom informed the inmates that they needed to notify the healthcare unit that they had a medical emergency (Doc. 105-2, at p. 10, 31). She then returned to the healthcare unit. Sandstrom testified that because it was loud in the segregation unit, she had been instructed in the past to get out quickly because it can be a safety issue when the inmates are "all worked up like that." (*Id.* at p. 32).

Upon returning to the healthcare unit, Sandstrom informed the nurses that there was a bleach spill and that a lot of inmates were complaining of breathing issues (*Id.*). She informed the nurses that the inmates were instructed to declare a medical emergency if they had difficulty breathing (*Id.* at p. 10). The nurses were at the front desk and were the

staff who usually responded to medical emergencies (*Id.*). She returned to her work and did not know if any inmates reported an emergency or if any were treated (*Id.* at p. 11).

There is some discrepancy as to when Gill received care for his symptoms. His testimony is not entirely clear on this point. He testified that he was refused medical care on October 4, but then stated that he did receive medical care after complaining to other nurses and was seen by Nurse Macalin (Doc. 105-1, p. 42). The medical records indicate a health status on October 4, 2019, at 4:00 p.m., and state that Gill was examined by a nurse the next day at 10:45 a.m. (Doc. 105-3, p. 1). Gill testified that Nurse Macalin came over and saw each inmate in the foyer of the unit (*Id.* at p. 42). She also set up appointments for inmates to see the doctor (*Id.* at pp. 42-43). On October 5, Gill noted that he was better than yesterday (Doc. 105-3, p. 1). On October 8, 2019, he was assessed by another nurse (*Id.* at p. 3). He testified that he later saw Dr. Larson (Doc. 105-1, p. 43). On October 9, 2019, he complained about having chest pains and was placed in the infirmary for 72 hours and had three EKGs to ensure his chest was normal (*Id.* at pp. 43-44, 79; Doc. 105-3, pp. 5-9, 23). At an unrelated spinal consultation on October 10, 2019, he had no complaints of respiratory or cardiovascular issues (Doc. 105-3, p. 20). His respiration was easy and non-labored (*Id.*). His cardiovascular exam was also normal (*Id.*). A subsequent x-ray ordered by Dr. Larson upon his return from the consultation showed that his heart and vasculature was within normal limits; his lungs were clear of infiltration (*Id.* at pp. 13, 25). An EKG from that same day was also normal (*Id.* at pp. 11-12, 24).

## LEGAL STANDARDS

### A. Summary Judgment Standard

Federal Rule of Civil Procedure 56 governs motions for summary judgment. Summary judgment is appropriate if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law. *Archdiocese of Milwaukee v. Doe*, 743 F.3d 1101, 1105 (7th Cir. 2014), citing FED. R. CIV. P. 56(a). *Accord Anderson v. Donahoe*, 699 F.3d 989, 994 (7th Cir. 2012). A genuine issue of material fact remains "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). *Accord Bunn v. Khoury Enter., Inc.*, 753 F.3d 676, 681-82 (7th Cir. 2014).

In assessing a summary judgment motion, a district court views the facts in the light most favorable to, and draws all reasonable inferences in favor of, the nonmoving party. *Anderson*, 699 F.3d at 994; *Delapaz v. Richardson*, 634 F.3d 895, 899 (7th Cir. 2011). As the Seventh Circuit has explained, as required by Rule 56(a), "we set forth the facts by examining the evidence in the light reasonably most favorable to the non-moving party, giving [him] the benefit of reasonable, favorable inferences and resolving conflicts in the evidence in [his] favor." *Spaine v. Community Contacts, Inc.*, 756 F.3d 542 (7th Cir. 2014).

### B. Deliberate Indifference to Medical Needs

Prison officials violate the Eighth Amendment's proscription against "cruel and unusual punishments" if they display deliberate indifference to an inmate's serious medical needs. *Greeno v. Daley*, 414 F.3d 645, 652–53 (7th Cir. 2005) (*quoting Estelle v. Gamble*, 429 U.S. 97, 104 (1976) (internal quotation marks omitted)). *Accord Rodriguez v.*

*Plymouth Ambulance Serv.*, 577 F.3d 816, 828 (7th Cir. 2009) ("[D]eliberate indifference to serious medical needs of a prisoner constitutes the unnecessary and wanton infliction of pain forbidden by the Constitution."). A prisoner is entitled to reasonable measures to meet a substantial risk of serious harm—not to demand specific care. *Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir. 1997).

To prevail, a prisoner who brings an Eighth Amendment challenge of constitutionally-deficient medical care must satisfy a two-part test. *Arnett v. Webster*, 658 F.3d 742, 750 (7th Cir. 2011) (*citing Johnson v. Snyder*, 444 F.3d 579, 584 (7th Cir. 2006)). The first prong that must be satisfied is whether the prisoner has shown he has an objectively serious medical need. *Arnett*, 658 F.3d at 750. *Accord Greeno*, 414 F.3d at 653. A medical condition need not be life-threatening to be serious; rather, it could be a condition that would result in further significant injury or unnecessary and wanton infliction of pain if not treated. *Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010). *Accord Farmer v. Brennan*, 511 U.S. 825, 828 (1994) (violating the Eighth Amendment requires "deliberate indifference to a substantial risk of serious harm.") (internal quotation marks omitted) (emphasis added).

Prevailing on the subjective prong requires a prisoner to show that a prison official has subjective knowledge of—and then disregards—an excessive risk to inmate health. *Greeno*, 414 F.3d at 653. A plaintiff need not show the individual literally ignored his complaint, just that the individual was aware of the serious medical condition and either intentionally or recklessly disregarded it. *Hayes v. Snyder*, 546 F.3d 516, 524 (7th Cir. 2008). The standard is a high hurdle, requiring a "showing as something approaching a total

unconcern for the prisoner's welfare in the face of serious risks." *Rosario v. Brawn*, 670 F.3d 816, 821 (7th Cir. 2012).

## ANALYSIS

The parties dispute whether Gill suffered from a serious medical condition. Gill was exposed to fumes when two containers of chemicals were poured directly on the gallery floors. Gill testified that he was coughing and choking and later complained of tingling in his eyes, difficulty breathing, coughing, wheezing, and chest pains (Doc. 105-3, pp. 1, 3-9).

Even assuming Gill suffered from a serious medical need, there is simply no evidence in the record to suggest that Sandstrom acted with deliberate indifference. Sandstrom testified that she was in the unit only to provide eye drops to an inmate. When she entered the unit, she heard inmates yelling that they were sick, had burning eyes, and they were having difficulty breathing. She directed them to declare a medical emergency. There is no indication in the record that she had knowledge of Gill's specific complaints or that she had knowledge of his complaints of chest pain. In fact, Sandstrom testified that it was loud and difficult to distinguish who was talking due to the constant yelling (Doc. 105-2, p. 13). Gill acknowledged that all of the inmates were yelling at Sandstrom (Doc. 105-1, p. 76). Based on her training, she believed the yelling constituted a safety issue and she left after delivering the medication (*Id*. at p. 32). She did inform the nurses in the healthcare unit that they would be receiving medical emergency requests because she had instructed the inmates to declare an emergency in order to receive care. The records reflect that Gill did receive care for several days after the incident (Doc. 105-3,

pp. 1-9).

Gill testified that he believed Sandstrom should have removed him from the hazardous chemicals and obtained medical treatment for him and the other inmates (Doc. 105-1, p. 87). In his response, he argues that CDC guidelines recommend immediately removing individuals from the area where chlorine bleach fumes exist. He argues the CDC recommends exposed individuals immediately leave the area and get fresh air (Doc. 115, p. 3). *See also* CDC Emergency Preparedness and Response, https://emergency.cdc.gov/agent/chlorine/basics/facts.asp (last visited Feb. 10, 2023). But the failure to follow CDC guidelines does not amount to deliberate indifference. *Thompson v. City of Chicago*, 472 F.3d 444, 454 (7th Cir. 2006) ("[Section] 1983 protects plaintiffs from constitutional violations, not violations of state laws or…departmental regulations."). Nothing in the record indicates that Sandstrom had the ability to order the removal of all of the inmates from the unit. Further, Gill testified that he believed Sandstrom was the one who ordered the doors opened so that fresh air could reach the inmates (Doc. 105-1, pp. 76-77, 82, 84-85, 99). Gill fails to offer any evidence that Sandstrom's decision to instruct the inmates to declare a medical emergency, open the doors, and inform other nurses on duty of the issue was a "significant…departure from accepted professional standards or practices." *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014).

Finally, even if there was a delay in medical care caused by Sandstrom not providing immediate care, there is no evidence in the record to indicate that Gill was harmed by the delay. Gill testified that the chemicals were spilled on the unit at

approximately 10:45 a.m. (Doc. 105-4, p. 3) He further testified that he received medical care either later that day or the next day (Doc. 105-1, p. 42). The medical records reflect that, at the very latest, he received care from a nurse the next morning at 10:45 a.m. (Doc. 105-3, p. 1). He received additional care by healthcare staff for several days after the chemical spill. His EKGs for chest pain were normal (*Id.* at pp. 9, 23-24). Although a significant delay in care can amount to deliberate indifference, there is no evidence of significant delay. At the most, the delay was 24 hours; at the least it amounted to a couple of hours. *See also Berry v. Peterman*, 604 F.3d 435, 441 (7th Cir. 2010) ("A significant delay in effective medical treatment also may…[constitute] deliberate indifference….where the result is prolonged and unnecessary pain.").

Further, when a plaintiff's care is delayed, "the plaintiff [is required] to offer 'verifying medical evidence' that the delay (rather than the inmate's underlying condition) caused some degree of harm. That is, a plaintiff must offer medical evidence that tends to confirm or corroborate a claim that the delay was detrimental." *Jackson v. Pollion*, 733 F.3d 786, 790 (7th Cir. 2013) (internal citations omitted). *See also Walker v. Wexford Health Sources, Inc.*, 940 F.3d 954, 964 (7th Cir. 2019). Gill fails to offer any such evidence. His medical records demonstrate that he received care. His EKGs were normal, and his lungs were clear of infiltration (Doc. 105-3, pp. 23-25). Nothing in the medical records indicate that he was harmed by any delay in treatment. Thus, Sandstrom is entitled to summary judgment.

## CONCLUSION

For the reasons stated above, Sandstrom's motion for summary judgment

(Docs. 104, 105) is **GRANTED**. The Clerk of Court is **DIRECTED** to enter judgment in her favor and against Gill at the close of the case.

**IT IS SO ORDERED.**

**DATED:   February 13, 2023**

_____
**NANCY J. ROSENSTENGEL**
**Chief U.S. District Judge**